EL PUEBLO DE PUERTO RICO, apelado, *v.* REYNALDO RAMÍ-
REZ LEBRÓN, acusado y apelante.

Número: CR-87-66     Resuelto: 8 de marzo de 1989

*José H. Marti Fajardo*, abogado del apelante; *Norma Cotti Cruz,
Subprocuradora General*, y *Ricardo E. Alegría Pons, Procu-
rador General Auxiliar*, abogados de El Pueblo.

## SENTENCIA

## I

Reynaldo Ramírez Lebrón —acusado y encontrado cul-
pable por tribunal de derecho de una infracción al Art. 404
de la Ley de Sustancias Controladas de Puerto Rico, 24
L.P.R.A. sec. 2404— apela la sentencia de año y medio de
reclusión.[1] En esencia, cuestiona la validez constitucional
del registro efectuado por unos oficiales de la Universidad
Interamericana y la admisión en evidencia de su confesión
sin advertencias legales. No tiene razón.

## II

La prueba revela que en la noche de 16 de octubre de
1986, Ángel L. González —guardia universitario del recinto
de San Germán de la Universidad Interamericana de Puerto
Rico— descubrió un bulto abandonado en la grama. Tomó
posesión de él y lo llevó a su Supervisor Carmelo Santos.
Éste, al abrirlo, encontró picadura de marihuana y un pa-

---

[1] Le fue suspendida en virtud de la Ley Núm. 259 de 3 de abril de 1946,
según enmendada, 34 L.P.R.A. secs. 1026–1029.

quete de "papel dos en uno" de los que se usan para envolver esos cigarrillos. Previa comunicación al efecto, el bulto y su contenido fueron guardados en la caja fuerte de la oficina del Supervisor Orlando Vega Mercado.

Al día siguiente, el estudiante Ramírez Lebrón fue a reclamar el bulto. A solicitud de Vega Mercado se lo describió, aunque Ramírez Lebrón indicó que sólo contenía ropa deportiva. Vega Mercado le inquirió si había algo más. Ramírez Lebrón permaneció callado, nervioso y pidió hablar en privado. Ambos, en unión a Ernesto Quiñones, se trasladaron a otra oficina. Allí informó que desde los trece (13) años era adicto a drogas, que su mamá le daba cinco dólares ($5) y que con ese dinero compraba marihuana. El bulto se extravió mientras se encontraba en *Rally*, lugar denominado como "Área Blanca".

El 20 de octubre de 1986, en virtud de una cita del Decano de Administración, Ramírez Lebrón firmó un documento en que aceptó que el bulto y su contenido le pertenecían. Después, el 21 de octubre, las autoridades universitarias notificaron a la División de Drogas de la Policía de Puerto Rico sobre lo sucedido. Ese día entregaron a los agentes lo ocupado. El análisis químico dio positivo a marihuana.

Denunciado por infracción al Art. 401 de la Ley de Sustancias Controladas de Puerto Rico, 24 L.P.R.A. sec. 2401, recayó la sentencia que nos ocupa.

## III

En las circunstancias peculiares expuestas, la normativa contra registros ilegales e irrazonables —Art. II, Sec. 10 de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1— no le cobija. Ramírez Lebrón no poseía expectativa de privacidad con referencia al bulto, que rutinariamente el guardián universitario encontró de noche en la grama del *campus*. Legítimamente las autoridades universi-

tarias, para poder identificar a su dueño, tuvieron que abrirlo. Al confrontarlo con la sustancia marihuana, éste admitió que era de su propiedad.

Tampoco cabe sostener infracción a su derecho a no incriminarse. *Rivera Escuté v. Jefe Penitenciaría*, 92 D.P.R. 765, 781 (1965). Su confesión fue espontánea y voluntaria, sin que mediara coacción. Tampoco se demostró común concierto o que fuera producto de la intervención de la Policía.

*Se confirma la sentencia apelada.*

Lo pronunció y manda el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Negrón García emitió opinión concurrente, a la cual se une el Juez Asociado Señor Rebollo López. El Juez Asociado Señor Hernández Denton disintió sin opinión escrita.

*(Fdo.)* Francisco R. Agrait Lladó
*Secretario General*

—O—

Opinión concurrente del Juez Asociado Señor Negrón García, a la cual se une el Juez Asociado Señor Rebollo López.

I

Reynaldo Ramírez Lebrón fue acusado y encontrado culpable por la infracción al Art. 404 de la Ley de Sustancias Controladas de Puerto Rico, 24 L.P.R.A. sec. 2404. Sentenciado a año y medio de reclusión,[1] en apelación cuestiona la validez constitucional del registro efectuado por unos oficiales universitarios y la admisión en evidencia de su confesión sin que éstos le hicieran las advertencias legales. Expongamos su trasfondo fáctico.

---

[1] Le fue suspendida acorde con la Ley Núm. 259 de 3 de abril de 1946, según enmendada, 34 L.P.R.A. secs. 1026–1029.

## II

La noche de 16 de octubre de 1986 el guardia universitario Ángel L. González *descubrió un bulto abandonado* en la grama del recinto de San Germán de la Universidad Interamericana de Puerto Rico. Lo tomó y, poco tiempo después, lo entregó a su Supervisor Carmelo Santos. Éste, en su presencia, lo abrió y encontró —entre otras cosas— lo que aparentaba ser picadura de marihuana y un paquete de "papel dos en uno" típicamente usado como envoltura para tales cigarrillos. A raíz del hallazgo, Santos se comunicó con su Supervisor Orlando Vega Mercado, quien procedió a guardar el bulto y su contenido en la caja fuerte de su oficina en el recinto.

Al otro día, el estudiante Ramírez Lebrón se presentó a su oficina a reclamar el bulto. Vega Mercado le pidió que se lo describiera. Ramírez Lebrón sólo le indicó que contenía ropa deportiva. Entonces, Vega Mercado le preguntó si en el bulto había algo más. Ramírez Lebrón permaneció callado, se mostró nervioso y pidió hablar con alguna persona en privado. A tal efecto, en unión a Ernesto Quiñones, se trasladaron a otra oficina. Allí, voluntariamente, informó que desde los trece (13) años era adicto a drogas, que su papá estaba desempleado, que su mamá era secretaria en una fábrica de Mayagüez y que le daba cinco dólares ($5). De ese dinero él sacaba para comprar marihuana. El bulto se le había extraviado mientras se encontraba en el *Rally*, en un lugar denominado como "Área Blanca".

El 20 de octubre de 1986, por conducto del Decano de Administración, Ramírez Lebrón fue citado y firmó un documento en el que aceptó que tanto el bulto como su contenido le pertenecían. Subsiguientemente, el 21 de octubre, las autoridades universitarias se comunicaron con la División de Drogas de la Policía de Puerto Rico e informaron lo sucedido. Ese mismo día entregaron a los agentes lo ocupado. Las pruebas químicas de rigor corroboraron que se trataba de marihuana.

El 24 de octubre Ramírez Lebrón fue informado de una denuncia en su contra por infracción al Art. 401 de la Ley de Sustancias Controladas de Puerto Rico, 24 L.P.R.A. sec. 2401. Previo a los trámites de rigor, fue acusado y encontrado culpable por tribunal de derecho. Ello origina la apelación.

### III

En lo pertinente, el Art. II, Sec. 10 de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, ed. 1982, pág. 299, dispone:

> No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.
>
> .    .    .    .    .    .    .    .
>
> Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.

La Cuarta Enmienda a la Constitución de Estados Unidos, L.P.R.A., Tomo 1, ed. 1982, pág. 186, provee a su vez:

> No se violará el derecho del pueblo a la seguridad de sus personas, hogares, documentos y pertenencias, contra registros y allanamientos irrazonables, y no se expedirá ningún mandamiento, sino a virtud de causa probable, apoyado por juramento o promesa, y que describa en detalle el lugar que ha de ser allanado, y las personas o cosas que han de ser detenidas o incautadas.

En *Pueblo v. Dolce*, 105 D.P.R. 422, 429–431 (1976), expusimos las circunstancias históricas que motivaron la aprobación del aludido Art. II, Sec. 10, Const. E.L.A., *supra*. Véanse, además: *Pueblo v. Martínez Torres*, 120 D.P.R. 496 (1988); *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197, 207 (1984). En *Pueblo v. Conde Pratts*, 115 D.P.R. 307, 312–313

(1984), señalamos que "[l]a garantía contra registros e incautaciones irrazonables obedece históricamente a tres objetivos: amparar la intimidad de las personas y, más allá de ello, su dignidad como seres humanos; proteger sus documentos y otras pertenencias; e interponer la figura de un juez entre el ciudadano y el agente del orden público para brindar a aquél la seguridad debida sobre la razonabilidad de los procesos de registro, allanamiento e incautación, vía el juicio de un funcionario imparcial".

Ahora bien, esta garantía constitucional, igual que la Cuarta Enmienda de la Constitución federal, *supra*, es una prohibición contra el Gobierno que como regla general no se extiende a los ciudadanos particulares. A manera de ejemplo, consúltense: *United States v. Jacobsen*, 466 U.S. 109 (1984); *United States v. Andrini*, 685 F.2d 1094 (9no Cir. 1982); *United States v. Walther*, 652 F.2d 788 (9no Cir. 1981); *Walter v. United States*, 447 U.S. 649 (1980); *Coolidge v. New Hampshire*, 403 U.S. 443 (1971); *Burdeau v. McDowell*, 256 U.S. 465 (1921). Por tal razón, es admisible en casos criminales evidencia obtenida de registros por ciudadanos particulares aunque éstos no cumplan las exigencias de los registros que se les requiere a los funcionarios públicos. La regla cede cuando se demuestra que algún agente del Gobierno también participó en el registro privado o cuando el individuo actuó en circunstancias en las que medió sugestión, instigación o requerimiento de un agente del orden público o de un funcionario encargado de velar por el cumplimiento de la ley. Es decir, las garantías constitucionales son oponibles al ciudadano particular si actúa como un agente o instrumento del Estado. *Pueblo v. Rovira Ramos*, 116 D.P.R. 945 (1986);(2) *Coolidge v. New Hampshire*, supra; *United States*

---

(2) En este caso un agente de aduanas, luego de recibir una confidencia, por cuenta propia registró en una armería una bolsa que contenía una pistola car-

*v. Walther*, supra; *United States v. Andrini*, supra; Anotación, *Admissibility in Criminal Case, of Evidence Obtained by Search by Private Individual*, 36 A.L.R.3d 553 (1971).(³) El problema que confrontan los tribunales en este tipo de controversia es que muchas veces no puede distinguirse fácilmente la participación gubernamental ni asegurarse su completa ausencia. Esa área, denominada gris en la jurisprudencia norteamericana, exige que los casos se analicen uno a uno con aplicación de los principios generales. *United States v. Walther*, supra; *United States v. Sherwin*, 539 F.2d 1, 6 esc. 5 (9no Cir. 1976).

En el caso de autos, esa misión requiere el examen inicial de la interrogante siguiente: ¿qué grado de participación gubernamental es necesaria para que un ciudadano particular se transforme en agente del Estado? Esencialmente la contestación conlleva evaluar dos (2) factores: el conocimiento y consentimiento del Gobierno, y el propósito con que se realiza el registro.

En cuanto a las universidades, se ha reconocido que los registros por oficiales de instituciones *públicas* están sujetos a las restricciones constitucionales. Esto, sin embargo, no se extiende automáticamente a aquellos efectuados por oficiales de universidades privadas. Véanse: Nota, *Admissibility of*

---

gada. Aunque no hubo opinión del Tribunal, todos sus miembros coincidieron en que dicho agente actuó como uno gubernamental y no como ciudadano privado, por lo que le era oponible la garantía constitucional.

(³) Aunque generalmente ha sido rechazado por la jurisprudencia, algunos comentaristas sostienen que se debe aplicar la garantía contra registros irrazonables a personas privadas que tienen como función principal la investigación de actividades criminales. Véase W.R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, 2da ed., Minnesota, West Publishing Co., 1987, Vol. 3, Sec. 8.1(d).

En el caso de autos, resulta innecesario determinar si a los guardias universitarios aquí involucrados les debería aplicar la garantía constitucional por razón de sus funciones. Como veremos más adelante, aun cuando aplicara la disposición constitucional, el registro fue razonable. Además, el registro no fue efectuado durante la investigación de un asunto criminal.

*Evidence Seized by Private University Officials in Viola-
tion of Fourth Amendment Standards*, 56 (Núm. 3) Cornell
L. Rev. 507 (1971); R.C. Schubert, *State Action and the Pri-
vate University,* 24 Rutgers L. Rev. 323 (1970); W. Van
Alstyne, *The Judicial Trend Toward Student Academic
Freedom,* 20 U. Fla. L. Rev. 290 (1968); *Developments in the
Law: Academic Freedom,* 81 Harv. L. Rev. 1045 (1968); Co-
mentario, *Student Due Process in the Private University:
The State Action Doctrine,* 20 (Núm. 4) Syracuse L. Rev. 911
(1969); Notas, *Admissibility of Testimony Coerced by a
University,* 55 (Núm. 3) Cornell L. Rev. 435 (1970); Nota,
*Constitutional Law—Student Academic Freedom— "State
Action" and Private Universities,* 44 Tul. L. Rev. 184 (1969).
No obstante, las relaciones entre las universidades privadas
y la Policía de la localidad pueden ser de tal naturaleza que
establezcan un vínculo entre ambas que active la protección
constitucional en sus estudiantes.

Algunas jurisdicciones han invocado diversas teorías
para probar que las universidades privadas están prote-
gidas. Entre éstas cabe mencionar el recibo de fondos públi-
cos, la función pública de la educación y los contactos entre
las instituciones y el Estado (por ejemplo, oficiales públicos
en la Junta de Directores de las universidades, fijación por el
Estado de las normas reguladoras de la educación privada,
etc.). Estas teorías, por sí solas, no han tenido acogida uná-
nime a menos que quede demostrado que los funcionarios del
Estado han participado *específicamente* en la actividad bajo
ataque constitucional. Un elemento de especial considera-
ción es si el registro fue dirigido y efectuado por oficiales
según sus funciones universitarias tradicionales o si, por el
contrario, actuaron como agentes ejecutores de la ley. Anota-
ción, *Admissibility, in Criminal Case, of Evidence Obtain-
ed by Search Conducted By School Official or Teacher,* 49
A.L.R.3d 978 (1973).

Cabe apuntar que la demostración de la acción guberna-mental (*state action*), por sí sola no es suficiente para invali-dar el registro, pues es posible que por su razonabilidad caiga bajo las excepciones. *People v. Lanthier*, 488 P.2d 625 (Cal. 1971).[4]

En resumen, al evaluar si un registro efectuado por ciu-dadanos particulares es constitucionalmente impermisible —por haberse éstos constituido en agentes o instrumentos del Estado— deben considerarse los factores siguientes: (1) si medió paga por parte del Estado; (2) si en su planificación o ejecución participaron agentes del Estado; (3) el lugar donde se llevó a cabo; (4) si estaban presentes los agentes del Estado cuando el ciudadano particular lo efectuó (si medió consentimiento implícito); (5) el momento en que los agentes del Estado advinieron en conocimiento del registro; (6) si el ciudadano particular tenía alguna motivación independiente para realizarlo o si, por el contrario, lo efectuó sólo con el propósito de asistir al Gobierno, y (7) si el registro se puede concebir como parte de las tareas rutinarias del individuo.

## IV

Los registros, los allanamientos y las incautaciones que se realicen sin orden se presumen irrazonables. *Pueblo v. Narváez Cruz*, 121 D.P.R. 429 (1988); *Pueblo v. Malavé Gon-zález*, 120 D.P.R. 470 (1988); *Pueblo v. Vázquez Méndez*, 117 D.P.R. 170 (1986); *Pueblo v. Falú Martínez*, 116 D.P.R. 828 (1986); *E.L.A. v. Coca Cola Bott. Co.*, supra; *Pueblo v. Le-brón*, 108 D.P.R. 324 (1979); *Pueblo v. González Rivera*, 100 D.P.R. 651 (1972). Esta regla general, sin embargo, admite

---

[4] En este último caso, por ejemplo, un empleado descubrió marihuana en un cubículo de estudio en la biblioteca de la universidad. El Tribunal resolvió que aun si la universidad hubiese sido pública, el registro fue razonable de acuerdo con el significado de la Cuarta Enmienda de la Constitución federal, L.P.R.A., Tomo 1.

varias excepciones, a saber: (1) el consentimiento válido, *Pueblo v. Narváez Cruz*, supra; *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973); *United States v. Matlock*, 415 U.S. 164 (1974); *Pueblo v. Acevedo Escobar*, 112 D.P.R. 770 (1982); (2) el registro de la persona, del área y de las cosas que estén al alcance del sospechoso cuando es incidental y contemporáneo a un arresto válido, *Pueblo v. Zayas Fernández*, 120 D.P.R. 158 (1987); *Pueblo v. Del Río*, 113 D.P.R. 684 (1982); *Pueblo v. Dolce*, supra; *Pueblo v. Conde Pratts*, supra; *Pueblo v. Costoso Caballero*, 100 D.P.R. 147 (1971); *Pueblo v. Acevedo Escobar*, supra; (3) cuando existen circunstancias extraordinarias y se quiere evitar que desaparezca la evidencia, *Pueblo v. Nieves Vargas*, 101 D.P.R. 263 (1973); (4) las inspecciones administrativas en aeropuertos o en muelles para confiscar productos después que el Departamento de Agricultura federal ha declarado una cuarentena, *Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978); (5) las inspecciones administrativas(5) a negocios que tradicionalmente fueron objeto de amplia reglamentación pública, o que exista la expectativa de inspecciones frecuentes, y a aquellos a quienes el Estado les ha expedido una licencia para que puedan operar, *Pueblo v. Rodríguez*, 107 D.P.R. 804 (1978); *Marshall v. Barlow's, Inc.*, supra; *Camara v. Municipal Court*, 387 U.S. 523 (1967); (6) los registros a las celdas de los confinados, *Pueblo v. Falú Martínez*, supra; (7) la incautación de evidencia abandonada o arrojada por una persona, *Pueblo v. Ortiz Martínez*, 116 D.P.R. 139 (1985); *Pueblo v. Llanos Virella*, 97 D.P.R. 95 (1969); *Pueblo v. Rivera Martínez*, 97 D.P.R. 814 (1969); *Pueblo v. Arroyo Ramírez*, 96 D.P.R. 576 (1968); *Pueblo v. Erausquín Martínez*, 96 D.P.R. 1 (1968); *Pueblo v. Mo-*

---

(5) En *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197, 207 (1984), resolvimos que la garantía contenida en el Art. II, Sec. 10 de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, cubre tanto los registros administrativos como los penales. Circunstancias de emergencia pueden provocar excepciones a la regla general.

*rales Soler,* 94 D.P.R. 384 (1967); *Pueblo v. Colón Colón,* 88 D.P.R. 187 (1963); *Pueblo v. González Charón,* 83 D.P.R. 450 (1961); *Pueblo v. Del Valle,* 83 D.P.R. 457 (1961); (8) el registro de estructuras abandonadas, *Pueblo v. Erausquín Martínez,* supra; (9) el registro del compartimiento de pasajeros de un automóvil, *Pueblo v. Acevedo Escobar,* supra; (10) el registro de un automóvil si existen algunas circunstancias especiales, *Pueblo v. de Jesús Robles,* 92 D.P.R. 345 (1965); *Pueblo v. Malavé González,* supra; (11) el registro en circunstancias en que el acto ilegal se realiza a plena vista, *Pueblo v. Dolce,* supra; o cuando el agente obtiene el conocimiento a través de su olfato, *Pueblo v. Acevedo Escobar,* supra, y (12) el registro de evidencia abandonada en sitios donde no quepa, dentro de las circunstancias del caso en cuestión, el derecho a una expectativa razonable de intimidad (doctrina de campo abierto), *Pueblo v. Lebrón,* supra.

Anteriormente hemos señalado que "[l]a regla y sus excepciones albergan un solo propósito: lograr el ansiado equilibrio entre uno de los derechos humanos más esenciales y preciados en una democracia y el derecho de la propia comunidad a protegerse contra el crimen. El carácter pendular de la jurisprudencia en este campo se explica por la rotura del equilibrio en varias situaciones, por el peso desmedido que se le ha asignado a veces a uno u otro de los intereses en juego". *Pueblo v. Conde Pratts,* supra, pág. 313.

## V

La renuncia a una razonable expectativa de intimidad es el fundamento para eximir el registro de objetos arrojados o abandonados del requisito de una orden previa que predica la regla general. Ahora bien, ¿que significa objetos o evidencia abandonada? La jurisprudencia norteamericana le ha dado un significado de acuerdo con el derecho constitucional diferente a la definición que se le asigna en el derecho de propiedad. Véanse: *City of St. Paul v. Vaughn,* 237 N.W.2d

365 (1975); *Abel v. United States*, 362 U.S. 217 (1959); *Hester v. United States*, 265 U.S. 57 (1924). Así, la doctrina ha establecido que lo abandonado, en esencia, no es necesariamente la propiedad, sino las expectativas de intimidad que se tenían en el objeto. No obstante, esta conclusión no nos debe llevar, como afirma W.R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, 2da ed., Minnesota, West Publishing Co., 1987, Vol. 1, Sec. 206(b), pág. 467, "a presumir que siempre que alguien renuncia a la posesión o control [de un objeto], aunque brevemente, ha ocurrido un abandono para la Cuarta Enmienda. La pregunta fundamental es si el abandono ocurrió en circunstancias que indiquen que no retuvo expectativa de intimidad en el objeto." (Traducción nuestra.)

En la más reciente decisión sobre este tema, *California v. Greenwood*, 56 L.W. 4409 (1988), el Tribunal Supremo de Estados Unidos aprobó un registro e incautación sin orden de bolsas de basura dejadas por el apelante en la acera frente a su casa. Ante sus reclamos de que las bolsas plásticas estaban cerradas, de que eran de color oscuro, de que estarían poco tiempo afuera —pues serían recogidas en un día y horas fijas— y de que serían entremezcladas con otra basura que a su vez sería depositada en un vertedero, resolvió que el dueño de la casa no tenía una expectativa subjetiva de intimidad que la sociedad acepte como objetivamente razonable. Las bolsas de basura en la acera estaban accesibles a los animales, a los niños y a las personas que se dedican a la búsqueda de cosas de algún valor.

¿Qué criterios, pues, deben considerarse al evaluar si una persona conserva alguna expectativa de privacidad en un objeto abandonado? Fundamentalmente debe prestarse atención especial a lo siguiente: (1) si el abandono fue voluntario o inadvertido; (2) el lugar donde ocurrió el abandono; (3) las circunstancias en que fue abandonado; (4) la naturaleza y las características del objeto abandonado; (5) si hubo intentos

de recuperación del objeto abandonado; (6) el tiempo transcurrido entre el abandono y el intento de recuperación, y (7) las medidas tomadas para preservar la intimidad.(6)

## VI

A través de este prisma doctrinario resolvemos la validez constitucional del registro efectuado.

Primero, es claro que los guardias universitarios actuaron como ciudadanos particulares. No les es oponible la garantía constitucional contra registros irrazonables. El registro del bulto lo realizaron por iniciativa propia. No existe fundamento fáctico alguno que apoye la proposición de que los funcionarios universitarios actuaron según las órdenes o con la colaboración previa de los agentes del Estado.

Segundo, aun si aceptáramos que teóricamente los guardias universitarios actuaron en una empresa conjunta con los agentes del Estado, el apelante Ramírez Lebrón no puede invocar satisfactoriamente expectativa de intimidad alguna en el bulto abandonado. Aunque no se presentó prueba en apoyo de que el abandono del bulto fue inadvertido, acogemos su versión en ese sentido. Se probó que gestionó recuperarlo al día siguiente. Ahora bien, el bulto fue encontrado por el guardia universitario en la grama del recinto. En nada afecta que el abandono fuera o no deliberado, pues el guardia universitario González tampoco salió a su encuentro, sino que lo halló accidentalmente. La ocupación del bulto no fue un acto planificado. *United States v. Wedelstedt*, 589 F.2d 339 (8vo Cir. 1978). El guardia universitario tiene el deber de prestar vigilancia a la institución a la que pertenece. Como

---

(6) En *Pueblo v. Luzón*, 113 D.P.R. 315, 326 (1982), dijimos que los factores a considerarse al evaluar si en determinado lugar se tiene o se puede reclamar una "'razonable expectativa de privacidad'" son: (1) derechos de propiedad individuales; (2) las precauciones adoptadas para mantener la intimidad, y (3) las características del lugar, incluso su accesibilidad a la observación.

corolario de ese deber, tiene la obligación de una vez encontrado algún objeto revisarlo con el fin de obtener información del dueño, y así efectuar la correspondiente devolución, y con el propósito de cerciorarse de que el mismo no constituye peligro o amenaza alguna para la universidad y sus estudiantes. Esa es precisamente parte de la rutina de su trabajo. No puede afirmarse que al realizar el registro tenían en mente el objetivo de ocupar evidencia que pudiera utilizarse en un procedimiento administrativo o criminal. Fue después de varios días del registro que por voluntad propia informaron a la Policía.

Tercero, el bulto de tela no estaba identificado con el nombre de su dueño. Carecía, además, de una cerradura con llave. Si permanecía a la intemperie fácilmente cualquiera hubiese podido abrirlo. Circunstancialmente otro estudiante, trabajador o demás personal de la institución universitaria pudo haberlo encontrado y registrado.

En resumen, el bulto fue encontrado en un espacio abierto propiedad de la institución para la que trabajan los guardias que efectuaron el registro. En estas circunstancias era razonable esperar que lo abrieran y registraran, y luego lo mantuvieran en sitio seguro hasta que fuera reclamado o se localizara su dueño. Ramírez Lebrón no tenía expectativa de privacidad en qué amparar su reclamo de inconstitucionalidad.

## VII

Réstanos decidir el planteamiento sobre las advertencias legales. El Art. II, Sec. 11 de nuestra Constitución, L.P.R.A., Tomo 1, y la Quinta Enmienda de la Constitución federal, L.P.R.A., Tomo 1, consagran el derecho a no incriminarse. Para darle efectividad a este derecho, se ha reconocido que tan pronto la investigación se *centraliza sobre un sospechoso bajo custodia* comienza el proceso adversativo y surge la obligación de la Policía *u otra autoridad competente* de ad-

vertirle sobre su derecho constitucional a permanecer en silencio, a no incriminarse y a asistencia de abogado. *Pueblo v. Chaar Cacho*, 109 D.P.R. 316, 324 (1980); *Rivera Escuté v. Jefe Penitenciaría*, 92 D.P.R. 765 (1965). En *Rivera Escuté v. Jefe Penitenciaría*, supra, pág. 781, resolvimos que "toda admisión o confesión de otro modo voluntaria y admisible deba ser excluida, sin diferenciación alguna, porque no se hizo con la asistencia de abogado. *Cada caso deberá resolverse por sus propios hechos y circunstancias*". (Énfasis suplido.)

Así en *Pueblo v. Laguna Rodríguez*, 92 D.P.R. 831 (1965), sostuvimos que no era aplicable dicha regla porque las manifestaciones incriminatorias no se hicieron mientras se encontraba *bajo custodia policíaca*. En *Pueblo v. Colón Mejías*, 99 D.P.R. 14 (1970) —al confrontarnos un sospechoso a una persona particular— con las admisiones incriminatorias, decidimos que las mismas no eran admisibles, ya que el sospechoso estaba *detenido en un cuartel bajo la custodia e influencia de la Policía*. Alertamos que de sancionar esta práctica "[s]ería muy fácil para las autoridades obviar estas normas [(las advertencias)] haciendo intervenir en alguna etapa de la investigación a una persona particular y tratar de lograr una confesión o admisión incriminatoria libre de los requisitos constitucionales previos a su obtención". *Pueblo v. Colón Mejías*, supra, págs. 19–20.

Según la norma de *Rivera Escuté v. Jefe Penitenciaría*, supra, ¿son los guardias universitarios de la Universidad Interamericana de Puerto Rico *otra autoridad competente*? Resolvemos en la negativa. A los guardias *universitarios* de una universidad *privada* no puede adscribírsele esta categoría gubernamental. No son éstos funcionarios del Estado que ponen en ejecución la ley ni de ordinario actúan en común concierto o bajo la dirección de funcionarios públicos. Desde esta óptica, la garantía de no autoincriminación no puede

sostenerse. I. Betancourt y Lebrón, *Los Derechos del Acusado*, San Juan, Ed. Graficart, 1975, pág. 96.

La exposición narrativa de la prueba refleja que no es hasta el 21 de octubre de 1986 que el Estado, por virtud de una comunicación telefónica proveniente de la Universidad Interamericana de Puerto Rico, adviene en conocimiento de la situación que a la postre da lugar al encausamiento criminal del apelante Ramírez Lebrón. La eventual intervención de los agentes del Estado, presente siempre en cualquier caso, no desvirtúa ipso facto la admisión hecha —en las circunstancias aquí involucradas— a funcionarios privados ajenos al Estado. *Cf. United States v. Sherwin*, 539 F.2d 1 (9no Cir. 1976); *United States v. Bowers*, 739 F.2d 1050, 1055-1056 (6to Cir. 1984).

En resumen, la prueba demostró que al apelante Ramírez Lebrón no se le violó la garantía constitucional contra la autoincriminación. Los guardias universitarios no estaban obligados a hacerle las advertencias, no caen bajo la categoría de otra *autoridad competente* y no actuaron en coordinación o bajo la dirección de funcionarios del Estado. Ramírez Lebrón no estuvo en un interrogatorio bajo custodia policial ni se restringió su libertad. Voluntariamente expresó que quería hablar con alguna persona privadamente y admitió ser el propietario de la marihuana encontrada en el bulto.